**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

COLE ALEXANDER NORTON, an individual,
6634 Window Rock Lane,
Morrison, Colorado 80465

        Plaintiff,

    v.                                 Case No. 2:20-cv-772

MARQUETTE UNIVERSITY, a private,
non-stock corporation
1801 W. Wisconsin Avenue,
Milwaukee, Wisconsin, 53233

        Defendant.

---

**PLAINTIFF'S COMPLAINT**

---

Plaintiff Cole Alexander Norton ("Mr. Norton"), through his undersigned counsel, files this Complaint against Defendant Marquette University ("Marquette") and states as follows:

**<u>NATURE OF ACTION</u>**

This case arises out of Marquette's fraudulent omissions and misrepresentations, breaches of contract, unfair trade practices, violations of the Vocational Rehabilitation Act, 42 U.S.C. § 504, and intentional infliction of emotional distress directed at Mr. Norton. Marquette's misconduct began in 2016 when Mr. Norton interviewed for admission at Marquette's School of Dentistry ("Dental School") and continued throughout Mr. Norton's attendance at the Dental School. Mr. Norton comes from a proud family of dentists, including both his father and his mother. Mr. Norton committed

to attend the Dental School during its "early admission" process based on Marquette's representations that it would provide him the high-quality education and practical skills he required to achieve his lifelong dream of becoming a dentist. As a result of Marquette's actions, Mr. Norton has suffered damages and he did not receive what he was promised by Marquette, including a career in dentistry.

## PARTIES

1. Mr. Norton is an individual who resides at 6634 Window Rock Lane, Morrison, Colorado 80465.

2. Upon information and belief, Marquette is a private university incorporated as a non-stock corporation with its principal place of business located at 1801 W. Wisconsin Avenue, Milwaukee, Wisconsin, 53233. Marquette can be served with process by serving its registered agent Jeffrey M. Kipfmueller at 1250 W Wisconsin Avenue, Suite 205, Milwaukee, Wisconsin, 53233-2225.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because this action presents a federal question under the Rehabilitation Act of 1973, as amended, 42 U.S.C. § 504 ("Rehabilitation Act") and under 28 U.S.C. § 1367 insofar as Mr. Norton also raises claims under Wisconsin law.

4. This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 because the matter is between citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because defendant Marquette resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

# FACTUAL BACKGROUND

**A.     Representations Made by Marquette.**

6.     During the summer and fall of 2016, Mr. Norton initiated steps to apply for entry into graduate schools in the field of dentistry.

7.     To that end, Mr. Norton applied to the Marquette Dental School, and the Dental School invited him to come to the Dental School for admission interviews on October 31, 2016, ("Interviews"). During the Interviews, Mr. Norton spoke with approximately four different members of the admissions committee and/or faculty, including Brian Trecek ("Mr. Trecek"), the Director of Admissions at the Dental School. Dr. Patrick Longo and Dr. Bhoomika Ahuja also participated in interviews and made representations regarding the Dental School to Mr. Norton. Mr. Norton also received informational packets regarding the Dental School ("Packets") from Cassie Stewart upon check in for the campus interviews.

8.     The Packets state the Dental School faculty and administration at the time numbered 254, including 18 administrators, five (5) administrators with faculty rank, 20 regular or full-time faculty, 27 clinical-track full-time faculty, 12 participating faculty, and 172 adjunct faculty.

9.     Further, during the Interviews, Marquette represented its student-faculty ratio was 8:1, that an estimated 97% of its students passed the National Board of Dental Examinations ("NBDE") and approximately 95% of its students graduated with a Doctor of Dental Surgery ("DDS") from the Dental School. Mr. Trecek made these representations to Mr. Norton during his one-on-one interview with Mr. Norton on October 31, 2016 in a large classroom on the first floor of the Dental School.

10. Among other things, during the Interviews and through the Packets and other promotional materials, the Dental School also represented the following:

    a. The Dental School would provide a highly sophisticated, integrated curriculum with early and sustained clinic-like training starting the first year of the program so that Dental School graduates are prepared to address real dental issues from day one. This represented a shift from traditional, exclusive classroom, lecture style learning to a combination of classroom and practical hands-on training. It was represented that the first two years of the program included access to a simulation lab, where students could practice dental skills on mannequins, with oversight and guidance from trained faculty members. In years three and four of the program, students would receive further training in sponsored clinics, learning on real patients, with the oversight and guidance of practicing dentists. The Dental School stated further that students would spend approximately 50 percent of their time treating patients and performing rounds with practicing dentists and "[e]very step you take in this intense four-year program will be guided by experienced faculty focused on practical applications."

    b. The Dental School would provide a curriculum centered around technologically advanced, patient-centered school/clinic facility and student-centered, interactive faculty. The Dental School claimed students would have access to simulation labs and clinics

4

that offered the latest technology, individualized instruction by highly skilled faculty and dental practitioners, and all the necessary tools for the development of practical skills.

c.  Mr. Norton would have access to a unique mentorship program, where students would learn from practicing Wisconsin Dental Association dentists. It represented that these advisers would mentor students one on one or in small groups and introduce them to professional networks.

11.    Marquette continued to make the above-referenced representations to Mr. Norton after he started dental school. Mr. Norton continued to receive informational brochures by and oral presentations from the Dental School that made similar representations each year that he was in school. Marquette made these continued representations as part of its effort to solicit Mr. Norton's continued attendance at the school and the payment of tuition to the school each term. Marquette made these continued representations to Mr. Norton as a member of the public, and each continued representation began a new contract term between Mr. Norton and Marquette.

12.    A few weeks after the Interviews, the Dental School extended an offer of admission to Mr. Norton. Based, at least in part, upon the foregoing representations made by the Dental School to Mr. Norton, Mr. Norton accepted this offer, elected to take early admission into the Dental School, and paid a $5,000 deposit to hold his place. By accepting entry on early admission, Mr. Norton was committed to the Marquette Dental School, foreclosing any opportunity to attend other dental schools.

13.    In late October or early November of 2017, Marquette, through a power point presentation by Marquette employee, Dr. Frederick Sutkiewicz ("Dr. Sutkiewicz"),

5

advised Mr. Norton that the Dental School employed experts to assist students in preparing for the required standardized examinations, including the NBDE, and to help students assess when they should schedule to take the tests based upon their level of preparedness. Dr. Sutkiewicz described this assistance as including study preparation guidance, including sample questions, study help, and mock examinations meant to simulate the actual test day environment.

**B.      Marquette Fails to Deliver on Its Promises.**

14.      Mr. Norton enrolled in the Dental School in or around August 2017.

15.      At the time Mr. Norton interviewed at the Dental School, Marquette represented the student-faculty ratio was 8:1. The actual student-faculty ratio at the time was closer to 10:1. Marquette revised its disclosures regarding student-faculty ratio to 10:1 at some time during Mr. Norton's time at Marquette. However, that rate continued to decline while Mr. Norton attended Marquette. At the time Mr. Norton left the Dental School, the student-faculty ratio was approximately 25:1. The decline in the student-faculty ratio deprived Norton of the education the Dental School promised him.

16.      Contrary to the Dental School's claim that the graduation ratio was approximately 5 percent, Mr. Norton's class experienced a much higher drop-out rate. On information and belief, an estimated minimum of 10 percent of the students who enrolled with Mr. Norton at the Dental School had dropped out or were in the process of repeating terms at the time Mr. Norton left the school.

17.      The Dental School did not deliver on the simulation lab and clinic experience it promised. Rather, lab and clinic hours were reduced and made hard to come by. Simulation lab operating hours were inconsistent, and access to the lab required permission which was difficult to obtain. Clinics were closed with little notice, making

access to the remaining clinics more difficult or nearly impossible to schedule, with more students attempting to schedule time at fewer clinics, leading to reduced access and long wait times. Access to full-time and part-time faculty at the lab and the clinics was also reduced and became virtually non-existent.

18.     As access to the simulation lab and clinics became increasingly difficult, the scheduling constraints and wait times took away from Mr. Norton's ability to focus on his studies and test preparation, including preparing for the NBDE. In addition, the Dental School's promise of interaction with and practical training from faculty and practicing dentists became an illusion. In short, the lack of robust access to the necessary and promised clinical hours and simulation lab time adversely affected Mr. Norton's performance on the NBDE and impacted his ability to meet the Dental School's curriculum requirements and to gain the practical dentistry skills promised by the school.

19.     In addition, Marquette did not deliver on its promise that it employed an expert to assist students in studying for required standardized examinations, including the NBDE. Prior to August 2018, the Dental School employed Dr. Sutkiewicz to serve in this role. Dr. Sutkiewicz left the school in or about August 2018, shortly after Mr. Norton had attempted to schedule a meeting with Dr. Sutkiewicz to discuss testing preparation. The Dental School did not hire a replacement for Dr Sutkiewicz for over a year. Several of Mr. Norton's unsuccessful NBDE Part I attempts took place during this time period. Norton was left without the promised support and assistance as he prepared for and took the NBDE.

20.     Instead of an expert dedicated to supporting students' testing needs, Marquette merely offered students access to standardized study courses, such as Kaplan. These courses were inadequate to assist and prepare students, including Mr. Norton, for

the NBDE, and did not serve as a reasonable substitute to the expert test support the Dental School had promised to provide.

21.     In addition, the Dental School did not provide course work in biochemistry – a component of the NBDE. This was the area of the NBDE where Mr. Norton required support and guidance. He intended to discuss and seek assistance from Dr. Sutkiewicz on this program deficiency. The Dental School offered no study classes or tutors in this area, and Mr. Norton sought guidance from the school on how to prepare this area of competency. Given that Dr. Sutkiewicz was not replaced at the time most critical to Mr. Norton's NBDE testing, Mr. Norton was unable to get the assistance and support he needed to successfully perform on the NBDE.

## C.     Mr. Norton Informed the Dental School Administration of His Need for Accommodations.

22.     During the fall of 2017, his first semester at the Dental School, Mr. Norton began to struggle with anxiety. He failed one exam. Seeking to address the issue, over Thanksgiving break, Mr. Norton consulted a physician, Dr. Charles Park ("Dr. Park"), who specialized in mental health issues. In fact, Dr. Park had experienced similar mental health issues when he was in medical school.

23.     Dr. Park diagnosed Mr. Norton with generalized anxiety disorder and prescribed a treatment plan, including specific medications, to help Mr. Norton deal with his disability and continue his studies. Dr. Park continued to treat Mr. Norton via telephone visits while Mr. Norton was at school or in person visits when Norton was at home.

24.     On or about February 1, 2018, Mr. Norton met with Associate Dean Dr. Lisa J. Koenig ("Dr. Koenig"), who was in charge of academic affairs, to inform her that he had

been diagnosed with generalized anxiety disorder, and to request her and the Dental School's help in navigating his way through dental school with his disability. After emotionally explaining his disability and his mental state to Dr. Koenig and seeking her guidance on how to deal with this condition as he continued with school, Mr. Norton was met with apparent disbelief. While Dr. Koenig did inquire whether Mr. Norton was experiencing suicidal thoughts, she inquired no further once he stated that he was not. Dr. Koenig offered only the help of the general counseling center at Marquette, which would require Mr. Norton to miss class to attend sessions. Dr. Koenig did not mention that Mr. Norton might be eligible for accommodations. Nor did she offer any assistance in accommodating his disability.

25.    Mr. Norton continued to visit with and receive treatment from Dr. Park, who ultimately wrote a letter which specifically addressed Mr. Norton's disability and his need for accommodation. The letter stated "I would recommend that you meet with your school as you will need accommodations given your recent flare up of symptoms. You may need accommodations when dealing with tests, coursework, and schedul[ing]."

26.    About a year after Mr. Norton first informed Dr. Koenig of his disability, on or about January 10, 2019, Mr. Norton again visited Dr. Koenig's office. Mr. Norton's purpose for this visit was to provide her the letter from Dr. Park, and to request that the school accommodate his disability diagnosis so that he could effectively continue with his studies.

27.    Mr. Norton again tried to discuss his disability with Dr. Koenig and seek her assistance with accommodating his disability. He tried to provide her with the letter from Dr. Park. Dr. Koenig refused to take it and review it. It seems that Dr. Koenig either did not care about Mr. Norton's disability or his request for accommodation - or she did not

believe him. In short, she refused to review the letter from Dr. Park that confirmed his disability and sought accommodation for that disability, even after Mr. Norton held it out to her. In any event, Dr. Koenig responded again with deliberate indifference to Mr. Norton's disclosure of his disability and his accommodation request.

28.     During the meeting, Mr. Norton specifically requested accommodation for his disability. He asked Dr. Koenig for guidance on how to proceed in obtaining accommodation for his disability. Dr. Koenig confirmed other students have been accommodated by the Dental School, but she refused to acknowledge and accept his request for accommodation. She did not discuss with him any specific accommodations that might address his disability. Nor did she provide any specific guidance or direction on how Mr. Norton should proceed with Marquette and/or the Dental School on his accommodations request.

29.     Dr. Koenig did not disclose to Mr. Norton at any time that he was entitled to accommodations or could request accommodations in connection with his normal course work. Nor did she advise him that he was entitled to or could request accommodation for the NBDE. She provided no direction or guidance to Mr. Norton on how to address the issues he was facing as a result of his disability or how to obtain accommodations for his disability. She offered no help whatsoever to Mr. Norton.

30.     Further, on information and belief, Dr. Koenig took no action on Mr. Norton's request to accommodate. She did not indicate she would discuss it with the University administration. She did not state she would refer the request to administration officials with responsibility for considering and responding to accommodation requests. She simply ignored his requests for accommodation. Neither she, nor the University, attempted to engage Mr. Norton in any dialogue regarding his accommodation requests

and, therefore, there was no interactive dialogue with Mr. Norton regarding his requests and there was no evaluation by the University of the reasonableness of his requests. As a result, Dr. Koenig, the Dental School, and Marquette did nothing to respond to and meet their obligation to consider Mr. Norton's accommodation request. Instead, Dr. Koenig only response was to suggest Mr. Norton consider contacting Marquette's general student counseling services if he needed mental help.

31.     In addition to ignoring Mr. Norton's disability and his request for accommodation and, in blatant disregard of his known disability, Dr. Koenig continued to harass and pressure Mr. Norton to sign up to take and retake the NBDE before he was ready to take the tests. For example, Dr. Koenig would come into Mr. Norton's classes to press him on scheduling to take the test. She falsely accused him of lying regarding the scheduling of the tests. She engaged in all of this inappropriate conduct with the knowledge that the promised test support from Dr. Sutkiewicz, or a qualified replacement, was unavailable to Mr. Norton at the time and without regard to the additional stress and pressure she was placing on Mr. Norton, thereby exacerbating his disability.

32.     Despite the Dental School's refusal to accommodate his disability, after his first semester at the Dental School, Mr. Norton passed all course work until the Dental School dismissed him, demonstrating that he is qualified to meet the essential eligibility requirements of the Dental School's program.

**D.     Mr. Norton Attempts the National Board Dental Examinations Without Necessary Accommodations.**

33.     Mr. Norton attempted Part I of the NBDE in or about September 2018. He scored a 73 on the test, where the passing score is 75.

34.     Prior to his second attempt, Dr. Koenig repeatedly emailed and spoke with Mr. Norton, pressuring him to retake the test before he was ready. She continued to give him arbitrary deadlines to take the examination.

35.     Mr. Norton took Part I of the NBDE for a second time on March 2019, and again did not receive a passing score, scoring a 74. After his second attempt of the NBDE, Mr. Norton met with Dr. Koenig to discuss a study plan for his third attempt. Since the Dental School still did not have a replacement for Dr. Sutkiewicz, Dr. Koenig's recommended study plan was Mr. Norton should take standardized study courses through Kaplan. She did not offer guidance or support regarding the biochemistry portion of the exam, and she did not offer mandatory study sessions or tutoring opportunities, both of which are commonly offered at other dentistry schools.

36.     On April 24, 2019, Mr. Norton received a letter from Dr. Koenig summarizing their meeting. Dr. Koenig makes no mention of Mr. Norton's request for, or right to, accommodations.

**E.     Mr. Norton is Suspended from Marquette.**

37.     In or around July 2019, Mr. Norton attempted the NBDE for the third time and did not receive a passing score, again scoring a 74.

38.     Marquette's Handbook on Academic Policies and Procedures for Students ("Handbook") states that, upon failing the NBDE three times, students will be suspended from continued studies at the Dental School.

39.     The American Dental Association allows dental students to attempt each part of the NBDE five times. Marquette's policy as set forth in the Handbook is inconsistent with the American Dental Association's policy. The Handbook provides no rational basis for this deviation.

40.     As a result of his third unsuccessful attempt, on July 29, 2019, Mr. Norton received a letter from Dr. Koenig stating that if Mr. Norton withdrew from the Dental School, he would be allowed to do so, contingent upon his agreement to retake NBDE for a fourth time. Dr. Koenig falsely accused Mr. Norton of violating the Student Code of Conduct, alleging that Norton had "lied" to Dr. Koenig on two previous occasions. This claim was pretextual and had no basis in fact. Dr. Koenig suspended Mr. Norton without regard to his notice of disability and request for accommodation. Mr. Norton was informed that, by withdrawing, he would be allowed to reapply to Marquette upon achieving a passing score on the NBDE. Other students were not dismissed after three unsuccessful attempts; instead, they were permitted to repeat a year of school.

41.     Given Dr. Koenig's position and with no alternative or accommodation being offered by Marquette, Mr. Norton withdrew from Marquette and prepared on his own for his fourth NBDE attempt.

42.     Mr. Norton, with the help of counsel, and after receiving no direction or assistance from Marquette, obtained a testing accommodation pursuant to the ADA.

43.     In or around December 2019, Mr. Norton attempted the NBDE for the fourth time and did not receive a passing score, again scoring a 74.

44.     As a result of this fourth unsuccessful attempt, Mr. Norton was formally dismissed from the Dental School. Dr. Koenig explained the dismissal process and requested Mr. Norton sign paperwork dismissing him from the Dental School.

**F.     Mr. Norton Attempts to Transfer to Another Dental School.**

45.     Upon his dismissal from the Dental School, Mr. Norton asked Dr. Koenig, via email, for a letter of recommendation so that he might continue his studies at another school. Dr. Koenig had previously assured Mr. Norton that she would write him a letter

13

of recommendation to transfer. To date, Dr. Koenig has not responded to Mr. Norton's request.

46. More than 90 days has passed since Mr. Norton was dismissed from Marquette, rendering Norton ineligible to transfer to other dental schools and, thereby, eliminating any chance he has to become a practicing dentist.

## COUNT ONE – BREACH OF CONTRACT

47. Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

48. Mr. Norton and Marquette entered into a series of yearly contracts with Marquette when Marquette accepted yearly tuition payments from Mr. Norton to attend the Dental School. As part of the parties' contracts, Marquette made specific written and oral promises to Mr. Norton regarding the education the Dental School would provide to him. Norton relied upon these promises and the promises were key reasons he chose to apply to and attend the Dental School. Marquette failed to deliver on these promises.

49. Marquette breached its yearly contracts with Norton by failing to meet the following obligations:

   a. Failing to provide a student-faculty ratio of 8:1 or 10:1;

   b. Failing to achieve graduation rate above 97%;

   c. Failing to achieve NBDE passage rate above 95%;

   d. Failing to provide adequate simulation lab opportunities and training;

   e. Failing to provide adequate clinical opportunities and training;

   f. Failing to provide requested disability accommodations;

   g. Failing to provide adequate guidance, support and tutoring for the NBDE;

50.     Mr. Norton paid consideration in the form of tuition and fees and performed all of his obligations, if any, under the contracts.

51.     As a direct and proximate result of Marquette's breach of its contracts with Mr. Norton, Mr. Norton incurred damages in an amount to be determined at trial, but at least the amount of tuition paid to Marquette.

<u>**COUNT TWO – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**</u>

52.     Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

53.     Mr. Norton and Marquette are parties to a series of valid and enforceable contracts.

54.     The contracts contained an implied covenant of good faith and fair dealing.

55.     Mr. Norton fulfilled his duties, if any, under the contracts. Marquette has not.

56.     In bad faith, Marquette failed to deliver on the specific written and oral promises it made to Mr. Norton regarding the education the Dental School would provide to him.

57.     Marquette's breaches of the implied covenant of good faith and fair dealing have caused damages to Mr. Norton in an amount to be proven at trial.

<u>**COUNT THREE – FRAUDULENT OR INTENTIONAL MISREPRESENTATION AND INDUCEMENT**</u>

58.     Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

59. Marquette intentionally misrepresented:

    a. Its student-faculty ratio;

    b. That students would be afforded access to clinical hours as a part of their education and that Marquette had adequate faculty to accommodate the same;

    c. Its graduation rate;

    d. Its NBDE passage rate;

    e. Access to experts to assist students in preparing for and taking the NBDE.

60. Each of the above-referenced misrepresentations was material and Marquette intended to deceive Mr. Norton and to induce Mr. Norton to commit to attend, continue to attend, and to pay for dental school education at Marquette.

61. Mr. Norton did not know that Marquette's above-referenced misrepresentations were false, and, thus, Mr. Norton reasonably and justifiably relied on the misrepresentations when committing to attend and continuing to attend the Dental School. Mr. Norton would not have committed to attend or continued to attend the Dental School had he known the truth behind Marquette's false and fraudulent pretenses, representations, and promises.

62. Mr. Norton has been damaged in that he paid tens of thousands of dollars in the form of tuition and fees to the Marquette, yet, because of these misrepresentations, Mr. Norton was unable to complete his education, to successfully pass the NBDE, and to practice dentistry.

63.     Marquette's conduct in perpetrating the above-referenced fraud was undertaken with intentional disregard for the known rights of Mr. Norton. At a minimum, Marquette was at least negligent in providing the false and fraudulent information.

64.     Marquette's fraudulent conduct has caused damages to Mr. Norton in an amount to be proven at trial.

## COUNT FOUR – VIOLATION OF WISCONSIN DECEPTIVE AND UNFAIR TRADE PRACTICES ACT/FALSE ADVERTISING, WIS. STAT. § 100.18, et seq.

65.     Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

66.     The Wisconsin Deceptive and Unfair Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18, prohibits deceptive acts or practices in the conduct of any trade or commerce.

67.     Marquette made representations to Mr. Norton as a member of the public with the intent to induce Mr. Norton to attend or to continue to attend the Dental School; the representations were untrue, deceptive, or misleading; and, the representations materially induced or caused pecuniary loss to Mr. Norton.

68.     Mr. Norton was a member of the public throughout the time Marquette made these misrepresentations.

69.     Marquette was in a position to implement effective business practices to guard against the use of false information to induce persons to attend or to continue to attend the university. Instead, Marquette profited off the false, deceptive, or misleading representations while burdening Mr. Norton with the cost of an education he cannot use, as a result of their misconduct and misrepresentations.

70.     The foregoing conduct constitutes an unfair, deceptive, unscrupulous, and immoral trade practice that is against public policy, in violation of the WDTPA.

71.     Each act by Marquette that was deceptive, in violation of the WDTPA, includes but is not limited to:

    a.  Failing to accurately represent its faculty-student ratio;

    b.  Failing to accurately represent its NBDE passage rate; and

    c.  Failing to accurately represent its graduation rate.

    d.  Failing to provide promised access to simulation lab and clinics;

    e.  Failing to provide training, oversight and guidance by qualified faculty and practicing dentists;

    f.  Failing to provide expert test support.

72.     Marquette's conduct and promises were relied upon by Mr. Norton and induced Mr. Norton to initially commit to and to continue to attend the Dental School.

73.     The aforementioned conduct and misstatements of Marquette constitute violations of the WDPTA and each caused substantial damage and injury to Mr. Norton.

74.     Marquette's misconduct and misstatements have caused damages to Mr. Norton in an amount to be proven at trial, including, but not limited to, recovery of civil penalties for each of Marquette's violations, reasonable attorney's fees, and such other relief may be deemed appropriate.

## COUNT FIVE – REHABILITATION ACT VIOLATION - 42 U.S.C. § 504

75.     Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

76.     Mr. Norton has a mental impairment that qualifies as a disability under the Rehabilitation Act. Norton is a "handicapped person" as defined by the Rehabilitation Act.

77.     Mr. Norton is otherwise qualified for participation in the Dental School program. He can meet the eligibility requirements of the Dental School program, with or without accommodation.

78.     Mr. Norton advised Marquette of his disability and requested accommodation for that disability.

79.     Marquette failed to consider Mr. Norton's request for accommodation and did nothing to accommodate Norton's disability.

80.     Marquette subjected Mr. Norton to discrimination based upon his disability.

81.     Marquette receives Federal financial assistance.

82.     Mr. Norton has been damaged by Marquette's misconduct in an amount to be proven at trial, including, but not limited to, reasonable attorney's fees, and such other relief may be deemed appropriate.

**COUNT SIX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

83.     Mr. Norton incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

84.     Marquette intended to cause Mr. Norton emotional distress when it:

     a.   Failed to provide sufficient faculty and practicing dentists to effectively educate its students;

     b.   Failed to provide sufficient simulation lab and clinic access to provide proper and complete practical dental training;

c. Failed to provide the promised expertise to assist students in preparing for and taking the NBDE.

d. Failed to acknowledge Mr. Norton's disability or to respond to his request to accommodate his disability;

e. Engaged in conduct that was designed to or had the effect of exacerbating Mr. Norton's disability, adding to his anxiety and undermining his efforts to address his disability and successfully complete his education;

85.     Marquette's conduct was extreme and outrageous.

86.     Marquette's conduct caused Mr. Norton extreme, disabling emotional distress.

87.     As a result of Marquette's conduct, Mr. Norton is entitled to recover for compensatory damages in an amount to be determined at trial plus pre-judgement and post-judgment interest, attorney fees, costs, and such further relief deemed just and warranted.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Norton prays the Court enter judgement in his favor and against Marquette as follows:

a.     All damages as requested above and proven at a hearing or trial;

b.     Pre- and post-judgment interest on these damages, as allowed by law;

c.     Reasonable and necessary attorney's fees incurred in connection with this action and all subsequent appeals;

d.     Court costs; and

e.     Such other and further relief as the Court deems equitable and just.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF HEREBY DEMANDS A**

**TRIAL BY A TWELVE (12) PERSON JURY IN THE ABOVE MATTER**

Dated: May 21, 2020.

GIERKE LAW LLC

By: s/ Nora E. Gierke
Nora E. Gierke, WI State Bar No. 1033618
Gierke Law LLC
1011 N. Mayfair Road, Suite 304
Wauwatosa, Wisconsin 53226
Telephone: (414) 395-4602
Email: ngierke@gierkefrank.com

Of Counsel:
Eric B. Liebman (ED WI admission pending)
Rebecca B. DeCook (ED WI admission pending)
Caleena S. Braig (ED WI admission pending)
Allison M. Hester (ED WI admission pending)
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202-1486

*Attorneys for Plaintiff Cole Alexander Norton*